Filed 4/17/19; opinion following recall of remittitur

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>GREGORY YUSUKE SHIGA,<br><br>　　Defendant and Appellant. | B256009<br><br>(Los Angeles County<br>Super. Ct. No. KA097949) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Thomas C. Falls, Judge. Affirmed in part; reversed in part and remanded for resentencing.

Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Lance E.

---

\*	Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of part C., D., E., F.1., F.3., G. and H. of the Factual and Procedural Background, and parts A., B., C., E. and F. of the Discussion.

Winters, Assistant Attorney General, Scott A. Taryle, Russell A. Lehman, David E. Madeo and Pamela C. Hamanaka, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

Defendant Gregory Yusuke Shiga was convicted of aggravated arson, arson of a structure, arson of an inhabited structure, possession of flammable material, and second degree burglary arising from the 2011 burning down of St. John Vianney Catholic Church in Hacienda Heights. The jury also found true the special allegations the arson was caused by use of a device designed to accelerate the fire or delay ignition; Shiga proximately caused multiple structures to burn; and Shiga caused property damage exceeding $3.2 million. The trial court sentenced Shiga to an aggregate state prison term of 18 years to life.

In the published part of the opinion, we conclude the crimes of arson of an inhabited structure and arson of a structure under Penal Code section 451, subdivisions (b) and (c),[1] respectively, are forms of the same offense of simple arson. Therefore, Shiga was erroneously convicted of both crimes. We reverse Shiga's convictions on counts 2 and 5 and remand for the People to elect on which count they want to proceed. Shiga also contends his convictions for arson of an inhabited structure and arson of a structure must be reversed because the offenses are lesser included offenses of aggravated arson under section 451.5. This contention lacks merit because a defendant can commit

---

[1] All further undesignated references are to the Penal Code.

2

aggravated arson without necessarily committing arson, whether of a structure or an inhabited structure.

In the unpublished part of the opinion, we address Shiga's contentions concerning his competence to stand trial and to represent himself at trial. In Shiga's initial appeal, he argued the trial court erred in failing to conduct hearings on his competency to represent himself and to stand trial. We agreed, and remanded with instructions to the trial court to determine whether it was feasible retrospectively to determine Shiga's mental competency at the time of trial to represent himself and to stand trial, and if it was feasible, whether Shiga was competent in both respects. (*People v. Shiga* (2016) 6 Cal.App.5th 22, 50 (*Shiga I*).) On remand the trial court concluded a retrospective determination of Shiga's competency was feasible, and found that at the time of trial Shiga was both competent to represent himself and to stand trial. In this reinstated appeal, Shiga contends the trial court erred in both these determinations. We conclude it did not.

In the unpublished portion of the opinion we also address numerous sentencing issues. Shiga contends in his supplemental briefing, the People concede, and we agree the trial court erred in failing to stay his sentence on count 3 for possession of flammable material pursuant to section 654 because this offense was based on Shiga's possession of the flammable materials he used to commit aggravated arson, for which he was sentenced on count 1.

The People also concede and we agree the trial court erred when it imposed two 5-year enhancements under section 451.1, subdivision (a), on count 2 for the use of a device designed to accelerate the fire (§ 451.1, subd. (a)(5)), and causing multiple structures to burn (§ 451.1, subd. (a)(4)), because subdivision (a)

3

provides for a single enhancement "if one or more" of the bases for the enhancement are true. Therefore, if the People elect to proceed on count 2, the trial court may only impose one of the two enhancements under section 451.1. We also agree, as conceded by the People, the jury's true finding on count 1 as to the five-year enhancement under section 451.1, subdivision (a), must be reversed because the enhancement only applies to a conviction for a "felony violation of Section 451," not aggravated arson under section 451.5.

Finally, Shiga contends in his second supplemental briefing the enhancement the trial court imposed on count 2 under former section 12022.6, subdivision (a)(4), for causing damage in excess of $3.2 million, must be stricken because the enhancement was repealed by its own terms, effective January 1, 2018. (Former § 12022.6, subd. (f).) We reject this contention because the repeal of former section 12022.6 does not apply retroactively.

We reverse Shiga's convictions for arson on counts 2 and 5. On remand the People should elect whether to proceed on count 2 under section 451, subdivision (c), or count 5 under section 451, subdivision (b), and the trial court should then enter a conviction on one of the offenses. We also reverse the jury's true finding on the section 451.1, subdivision (a), enhancement as to count 1. We remand for resentencing with directions for the trial court to stay Shiga's sentence on count 3 for possession of flammable material pursuant to section 654 and, if it reinstates Shiga's conviction on count 2, to impose only one 5-year sentence enhancement under section 451.1, subdivision (a).

4

## FACTUAL AND PROCEDURAL BACKGROUND[2]

A.   *The Arson of the Church*

On April 15, 2011 St. John Vianney Catholic Church in Hacienda Heights was set on fire.  The blaze quickly spread to an adjacent rectory where two of the church's priests were sleeping. Both priests safely escaped the flames, but the firefighters were not able to save any portion of the church.

B.   *The Information*

An amended information charged Shiga with aggravated arson (§ 451.5, subd. (a); count 1); arson of a structure (§ 451, subd. (c); count 2); possession of flammable material (§ 453, subd. (a); count 3); second degree commercial burglary (§ 459; count 4); and arson of an inhabited structure or property (§ 451, subd. (b); count 5).  The information further alleged as to counts 1, 2, and 5, the arson was caused by use of a device designed to accelerate the fire or delay ignition (§ 451.1, subd. (a)(5)); as to counts 1 and 2 Shiga proximately caused multiple structures to burn (§ 451.1, subd. (a)(4)); and as to count 2 Shiga caused property damage exceeding $3.2 million in value (former § 12022.6, subd. (a)(4)).

---

[2]   In our discussion of the factual and procedural background of the case, we focus on the proceedings relevant to this appeal. We discuss the earlier proceedings in greater detail in *Shiga I, supra*, 6 Cal.App.5th 22.

C.    *The Department 95 Proceedings**

In July 2012 the trial court appointed Dr. Nadim N. Karim as a defense expert to evaluate Shiga's competence to stand trial. During the assessment Shiga told Dr. Karim he would be found not guilty at trial on the arson charges "based on the evidence." Shiga explained, "My DNA is not on the tissue. The video is not a clear picture. There are no fingerprints." When Dr. Karim asked Shiga if he had released his mental health records to his attorney, Shiga responded, "I'm not mentally ill. I'm not using my mental illness as a reason for this crime. [¶] . . . [¶] . . . I'm in no position to use my mental illness as an excuse for anything. . . . [¶] . . . How is my mental illness going to help me at all?"

In his July 29, 2012 report, Dr. Karim described Shiga as having symptoms of schizophrenia and opined Shiga was incompetent to stand trial because he lacked the "sufficient present ability in order to assist his attorney in his defense" due to "his fixed false belief (perhaps even delusional ideation) that he does not have a mental illness, and that his mental illness has nothing to do with his defense."

On July 30, 2012 defense counsel requested the trial court declare a doubt as to Shiga's competency to stand trial. The trial court declared a doubt, ordered the criminal proceedings suspended, and transferred the case to the Mental Health

---

*      See footnote, *ante*, page 1.

Department of the Los Angeles Superior Court (Department 95) to determine Shiga's competency.[3]

The court appointed Dr. David C. Stone to assess Shiga. Dr. Stone met with Shiga for approximately one hour on August 28, 2012, and issued his report on October 15. Dr. Stone opined Shiga suffered from a psychiatric disorder, most likely chronic paranoid schizophrenia. Dr. Stone opined Shiga was able to understand the nature of the proceedings against him, but was not able to assist counsel in his defense in a rational manner. Dr. Stone based his conclusion on Shiga's denial he suffered from schizophrenia or other mental illness, his minimization of his symptoms, and his ambivalence about allowing his attorney to introduce evidence of mental illness at trial. Dr. Stone noted, "While Mr. Shiga's intelligence helps him cover over psychotic symptoms better than other patients, with time, the psychotic material came out." Dr. Stone concluded Shiga was not mentally competent to stand trial.

On October 19, 2012, at the request of the People, the court appointed Dr. Kory J. Knapke to evaluate Shiga. Dr. Knapke evaluated Shiga on December 12, 2012 and issued his report the next day. Dr. Knapke found "no clinical evidence of psychosis during [his] clinical examination," and stated he "was somewhat puzzl[ed] as to why a doubt was declared concerning [Shiga's] competency." Dr. Knapke opined, "I strongly believe the defendant is competent to stand trial."

---

[3]   The record does not reflect which judicial officer presided over the July 30, 2012 proceeding. Judge Samantha Jessner presided over all proceedings involving Shiga in Department 95.

7

On December 19, 2012, in light of the conflicting opinions rendered by Drs. Stone and Knapke, the court appointed Dr. Sharma to evaluate Shiga. Dr. Sharma interviewed Shiga and found "no evidence of serious mental illness." Dr. Sharma concluded in his brief report he "agree[d] with Dr. Knapke" that Shiga was competent to stand trial.

On December 19, 2012 the trial court in Department 95 received the reports from Drs. Sharma and Knapke into evidence, and it found Shiga was "presently competent to stand trial." Department 95 transferred Shiga's case back to the trial court.

D.    *Defense Counsel's Request for a Continuance and Shiga's Request To Represent Himself*[*]

On the morning of June 19, 2013 the trial court[4] held an ex parte proceeding in camera with defense counsel to discuss defense counsel's request for a continuance of the trial date. Shiga was not present because he refused to leave his jail cell. Defense counsel sought a continuance for him to obtain the appointment of a mental health expert and to investigate whether Shiga had a defense based on lack of the requisite mental state to commit aggravated arson, a specific intent crime. Defense counsel explained Shiga was housed in the mental health area of the jail, and Shiga's competency to stand trial had earlier been in doubt. More recently, defense counsel had received Shiga's psychiatric file from Shiga's sister. The records showed a diagnosis of schizophrenia and delusions. Defense

---

[*]    See footnote, *ante*, page 1.

[4]    Judge Douglas Sortino.

8

counsel had also learned Shiga's regular psychiatrist had died sometime in the previous year.

During prior discussions between Shiga and his attorney about the possibility of a plea of not guilty by reason of insanity, Shiga had refused to consider an insanity plea "in any way, shape, or form." Defense counsel believed he would be providing ineffective assistance of counsel if he did not fully explore a mental health defense.

After resuming the matter in open court, the trial court ordered Shiga to be extracted from his jail cell the same day. When Shiga appeared that day, the court granted defense counsel's request for a 50-day continuance. Shiga objected to the continuance, stating he did not want to waive time, and he requested to represent himself. The court told Shiga another judge would hear his motion to represent himself that afternoon, and gave him a form containing a *Faretta* advisement and waiver of right to counsel. (*Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).)

E.    *Shiga's* Faretta *Hearings*[*]

On the afternoon of June 19, 2013 the trial court[5] heard Shiga's motion to represent himself. The court advised Shiga against self-representation and warned him it could be a "total disaster." The court explained Shiga would be disadvantaged because he did not understand trial procedure or the rules of evidence. Shiga responded he believed he was prepared and wanted to "give the jury a different point of view."

---

[*]    See footnote, *ante*, page 1.

[5]    Judge Jack P. Hunt.

9

The prosecutor cautioned that Shiga had refused to appear in court on a number of occasions, causing the court to issue extraction orders, and that discovery could not be fully redacted before the trial was scheduled to begin in two days. When the court warned Shiga he would be going to trial "with no tapes, no reports," Shiga responded he "would love to." The court continued the hearing on Shiga's motion and ordered him back in two days.

On June 21 Shiga's *Faretta* hearing resumed. The trial court[6] explained to Shiga that defense counsel wanted a mental health expert to assess him for a report that could assist his defense and possibly spare him a life sentence. Shiga said he understood he would not have the benefit of the report, but still wanted to represent himself. He explained he "would like to go in a different way to defend this trial."

The trial court conducted a "mini *Marsden*" hearing,[7] without the prosecutor present, to determine whether Shiga wanted to replace his attorney. The court asked Shiga if he had any complaints about his attorney other than his desire to present a mental health defense, and Shiga responded he did not. The court inquired of defense counsel if he would be willing to forego exploration of a mental health strategy and to represent Shiga at trial if Shiga "waive[d] effective assistance of counsel with regard to that issue." Defense counsel declined, saying it would be "malpractice." Shiga asked the court whether "using

---

[6]     Judge Thomas C. Falls presided over the continued *Faretta* hearing and Shiga's trial.

[7]     *People v. Marsden* (1970) 2 Cal.3d 118.

the medical records" in his defense "would be absurd." The court replied it was "not even remotely absurd."

The trial court again explained to Shiga why it was unwise for him to represent himself. Shiga stated, "I understand, your honor. To the fullest point, I do understand, but I believe that I have a chance in this case being able to let the jury understand that even with all the evidence, the uncircumstantial evidence, that it won't pass beyond a reasonable doubt." The court described Shiga's chances of winning against the district attorney as "almost impossible." The court suggested Shiga give his attorney 30 days to explore a mental health defense, and then decide about self-representation. Shiga declined and indicated he really wanted to go to trial.

The trial court called the prosecutor back into the courtroom. The court asked Shiga if he was willing to proceed with his attorney in the absence of a mental health defense. Shiga said he was not and repeated that he wished to represent himself. The court found Shiga's request for self-representation was unequivocal, "not conditioned on whether or not there's a psych defense." The court again advised Shiga against representing himself and reviewed the rights Shiga was waiving. Shiga said he understood and wanted a "speedy trial."

After the court's *Faretta* advisements, the prosecutor raised a concern over Shiga's competency to represent himself under *Indiana v. Edwards* (2008) 554 U.S. 164 (*Edwards*). The prosecutor pointed to Shiga's prior competency hearing, history of schizophrenia, failures to appear in court, and rejection of a mental health defense as reasons for the court to perform a "closer evaluation" before allowing Shiga to represent himself. The court declined to "take a second look" at the Department 95

11

competency determination. The court found Shiga was competent to waive his right to counsel and granted Shiga's *Faretta* motion. The trial court ordered the trial to start in three days.

On the day of trial, prior to jury selection, the prosecutor told the court she and defense counsel had redacted approximately 1,000 pages of discovery, but Shiga had not had an opportunity to review it. Shiga responded he did not need to review the discovery because he was "already prepared." The trial court warned Shiga if he failed to appear during trial, his right to self-representation would be immediately revoked.

F.    *The Trial*
      1.    *Jury selection*[*]
      On June 24, 2013 jury selection commenced. Shiga actively participated in the jury selection process. At one point, the prosecutor was inquiring of a prospective juror whether the juror would be willing to convict Shiga if a single witness testified to "every single element of every single crime." The prospective juror stated she would need more information, and would wonder why the prosecutor did not call other witnesses on her witness list. The prosecutor then asked the same question of the next prospective juror, who likewise stated, "I think I need to hear more." The prosecutor responded, "I know you would, but you don't have to. . . . Once you believe beyond a reasonable doubt that Mr. Shiga is guilty of these crimes, and that's every element. This one witness does it all." Shiga asserted an objection to the prosecutor's statement, which the trial court sustained. The

_____

[*]    See footnote, *ante*, page 1.

12

court instructed the prosecutor to refer to a hypothetical defendant rather than to Shiga in her statements to the prospective jurors.

Shiga also questioned a prospective juror on whether she had sufficient time to participate in the case because she was a college student. The prospective juror responded that summer school had not yet started. Shiga also inquired of another prospective juror who indicated she was a student studying psychology. Shiga asked how many years she had attended college and what experience she had in the field of psychology. The prospective juror responded she was starting her fourth year of college and had not yet graduated in the field of psychology.

Shiga also questioned several prospective jurors about their ability to understand English. One of the jurors was looking away as Shiga questioned him. Shiga asked him whether this was because he was not paying attention or he did not understand. When the prosecutor moved to dismiss the jurors for cause, Shiga initially argued for retention of three of the jurors, but later stipulated to excuse some of them. Based on Shiga's objection, the trial court denied the prosecutor's challenge to a prospective juror whose first language was Vietnamese.

After Shiga exercised his first nine peremptory challenges, the trial court commented, "I've been watching the jurors that you have been excusing. I think I understand why you're doing what you're doing, and I think you're doing a fine job on jury selection." In total, Shiga exercised peremptory challenges to excuse 13 prospective jurors. He excused a prospective juror who had previously served on a jury 13 or 14 times. He later excused a prospective juror whose husband was a retired military police officer and whose father and uncle were retired parole officers.

13

Shiga excused a prospective juror whose synagogue was burned down in an act of arson. He also excused a prospective juror who worked in a state prison and whose husband was retired from the military; a prospective juror who had been the victim of a violent crime; and a prospective juror who investigated child abuse for Los Angeles County and whose department had been the target of a terror attack.

2.      *The People's case*

Investigators determined the fire burned and spread quickly due to use of an accelerant. Rolls of toilet paper, which had been soaked in a medium petroleum distillate, were recovered from the debris. Because every other window on one side of the church was open, the fire was provided with oxygen, allowing it to grow at a faster rate.

Law enforcement spoke with several individuals who had encountered Shiga in the days and weeks preceding the fire. Shiga had visited his former grade school teacher about two weeks before the fire. He asked his teacher about a statue on the church's grounds depicting Christ's suffering on the cross. He told the teacher the Catholic Church had a lot of money and had done a lot of bad things, although it had not done bad things to him.

On April 6, 2011 Shiga entered a bible study team meeting at the church and questioned the congregants about the Catholic Church and the biblical basis for the pope's authority. The same day one of the priests saw Shiga walking down a hallway inside the priests' private rectory. Shiga walked past the priest and disappeared from view. The priest was surprised to see a

14

stranger in the rectory and tried to find where he had gone. The priest located Shiga outside, staring at the roof of the church.

Midday on April 15, 2011 a church member who was decorating the church sanctuary saw Shiga in the sanctuary. Shiga was walking through the sanctuary aisles and appeared to be inspecting various alcoves and staring at the floor behind a number of statues.

At around 11:00 that night, Shiga was sitting in a white car parked in the church parking lot. Shiga approached three teenage boys who were skateboarding on the church property and told them to leave immediately. Shiga then returned to his car. The boys continued skateboarding. A few minutes later Shiga returned and again told the boys to leave the property. The boys left, then returned 20 to 30 minutes later and saw the church was in flames. Video surveillance footage from inside the church sanctuary showed Shiga lighting a fire on the left side of the altar at approximately 11:54 that night.

Shiga was arrested on May 14, 2012. In a cell at the Norwalk sheriff's station, Shiga spoke to an undercover detective who was posing as an inmate. Transcripts of these conversations were admitted into evidence. Shiga told the detective he had "burned a church" and it "wasn't an accident." Shiga "didn't think people could get hurt." He believed the church's priests were doing bad things to children, and thought if he burned the church "word would get around and they'll stop."

Shiga explained to the detective he had stolen a weed sprayer with a backpack attachment, a household cleaning product, toilet paper, and a tiki torch from a home improvement store. Shiga used these tools to set the fire. Shiga went to the church the day of the fire and opened a number of windows so he

could reenter that night after the doors were locked.  Shiga also walked around the church, planning his crime.  While surveying the church's interior, he noticed a statue, which he thought he could douse with oil to accelerate the spreading of the fire.  Shiga also entered the rectory to investigate where the priests "do these bad things."

Shiga told the undercover detective he returned to the church that night.  Some people were there outside the church, and he twice told them to leave.  Once they left, Shiga entered the church through a window.  Inside the church, Shiga "opened a couple windows" because "a fire needs air—oxygen—because it eats the oxygen."  Shiga placed the toilet paper tissue on a large cross, as well as next to the drapes on both sides.  Shiga sprayed the toilet paper, ceiling, and "everything" with the weed killer.  Then he lit the tiki torch and used it to set the toilet paper and drapes on fire.  Shiga said he "lit all of them and [he] exited exactly the way [he] planned," through another window.  With the fire burning, Shiga returned to his car and left.

Shiga was interviewed at the station by two investigating officers.[8]  The trial court admitted a transcript of the interview into evidence.  When asked whether he intended to kill the priests, Shiga responded that because the arson was at night, he did not think anyone would be hurt.  Shiga had "no intention to hurt anybody."  The officers asked Shiga why he had entered the church rectory.  Shiga explained he wanted to see where the bad things occurred.  He described his motivation for the arson

---

[8]     Shiga waived his rights under *Miranda v. Arizona* (1966) 384 U.S. 436.

stating, "if this happened, the news will spread and [the bad things] would stop."

Shiga asked the officers how long a trial takes and how to ask for a speedy trial. He asked whether a speedy trial means "that the court starts early." One of the officers told Shiga to ask his attorney if he wanted a speedy trial.

When Shiga returned to his cell, he again spoke to the undercover detective. He said, "I'm going to try to do a speedy trial but I doubt . . . the district attorney will allow me to do a speedy trial." This was because "[t]hey have DNA evidence on the toilet paper and stuff." Shiga added that "if [the jury] know[s] that my intention wasn't to hurt anyone some of them might say I'm not guilty. Because they're gonna know I was trying to do it for a good cause and they're gonna say . . . I'm not guilty. And hopefully it's not a hung jury. Hopefully it's a decisive jury that will say I'm not guilty. If it's a hung jury I have to go back to trial again three times for a hung jury before . . . the case gets closed."

3.      *Shiga's cross-examination of witnesses**

Los Angeles County Fire Captain Michael Ponder testified he was on duty the night of the fire and responded to the scene to fight the blaze. The rapid rate at which the church and rectory burned were consistent with the use of a fire accelerant. On cross-examination, Shiga questioned Captain Ponder about the effects of smoke inhalation. Specifically, Shiga asked, in light of the size of the fire, how many breaths a person inside the church during the fire would have been able to take before losing

---

*        See footnote, *ante*, page 1.

consciousness.  Captain Ponder responded, "Everybody would be different."  When Shiga inquired whether it would be possible to catch the person who started the fire while the fire was burning, Captain Ponder responded, "Yes, it's possible to catch the person that started this fire."

Los Angeles County Sheriff's Sergeant Derek Yoshino testified he responded to the church on the night of the fire and was involved in the investigation.  During direct examination, the prosecutor asked Sergeant Yoshino, "What effect is the smoke going to have on an individual's confusion to get in and out of a location?"  Sergeant Yoshino responded that inhalation of toxic fumes during a fire can cause great confusion, which can lead to death.  While Sergeant Yoshino was describing a situation where someone had died from smoke inhalation, Shiga objected, "He was stating that a person in past research, that he died from the smoke.  [¶] . . . [¶] . . . If he is sure about that the smoke caused him to do that, does he know how long it took . . . how many intakes for this smoke?"  The trial court overruled the objection, but told Shiga he could ask this question after the prosecutor finished her examination.  Shiga later declined to cross-examine Sergeant Yoshino.

Los Angeles County Sheriff's criminalist Iris Cruz testified she had analyzed remnants of burned toilet paper rolls recovered from the scene of the fire.  She identified the toilet paper found at the scene as consistent with a specific brand of toilet paper.  On cross-examination, Shiga asked Cruz whether she had personally visited the scene of the fire.  She had not.  Shiga asked how she obtained the evidence.  Cruz responded it came from the trace evidence section.  Shiga later asked how long Cruz had known the prosecutor, to which she responded they first spoke that

18

morning. Shiga also asked how long after the fire Cruz had examined the evidence and whether Cruz had any knowledge of the nature of the structure that was burned prior to her analysis. Cruz responded she only knew about the fire from her examination of the evidence and she prepared her report two months after the fire. On recross-examination, Shiga inquired how long Cruz had worked in her profession, to which Cruz responded she had been in the document review section since 2008.

Douglas Guardado testified he was present on the church property at around 11:45 on the night of the fire. He was there to meet his friend Valerie. While he was walking between the church and the rectory, he saw a man inside the darkened church either opening or closing one of the church windows. On cross-examination, Shiga asked Guardado whether he was on the church property on the night of the fire. Guardado confirmed he was. Shiga then asked, "[W]ho is Valerie?" Guardado said she was a friend. Shiga asked no further questions.

Shiga cross-examined the church member who had seen him in the sanctuary of the church on the day of the fire. Shiga asked if she was "busy decorating" when she saw the man in the church sanctuary. She responded that two senior members of the decorating committee were doing most of the work, so she "was more or less standing around" and "watching people in the church." Shiga also asked whether the witness believed in God, which she stated she did.

Federal Bureau of Investigation (FBI) Special Agent Jason Ernst testified he had investigated the church fire. He reviewed video surveillance footage of the fire being set and searched the site of the fire. On cross-examination, Shiga asked Ernst about

his education and work history.  He also questioned Ernst about the meaning of the initials "F.B.I." and the importance of the agency's work.  Ernst responded, "I think I'm pretty important." Shiga inquired whether the FBI possessed any special power or privileges, and whether Ernst "abide[s] by the laws just like regular citizens?"  Ernst responded the FBI had the power to arrest people for crimes against the United States, but the agents had no special privileges.  Shiga also asked whether Ernst had conducted surveillance on him, to which Ernst responded he had. Shiga inquired whether Ernst had observed any "different behavior" by Shiga, to which Ernst responded Shiga was a "normal" individual, "for the most part."

When Shiga sought to follow up as to what Ernst meant by "for the most part," the trial court excused the jury and explained to Shiga the court had instructed Ernst not to testify regarding anything suggestive of Shiga's criminal history, including Shiga's prior sexual misconduct.  When asked by the trial court outside the presence of the jury how he would describe Shiga's interests, Ernst explained Shiga "likes to play poker, and he's got a preoccupation with sexual things . . . ."  Shiga indicated he wanted the court to lift the prohibition on Ernst testifying about Shiga's criminal background, and he would follow up with additional questions.

When the jury returned, Shiga, referring to himself, asked Ernst "other than the charge that he's charged with, do you believe that he is [a] danger to society?"  Ernst answered, "Yes, I do."  Shiga inquired further "in what way" Ernst felt he was dangerous.  Ernst responded Shiga was "arrested on prior occasions for several things."  Shiga continued, "But you never looked into why he was arrested—why he did the things he did in

20

the past for his arrest[s]?"  Ernst answered, "No, I didn't look into why he brandished a fake gun at somebody on the freeway.  I did not look into why he sexually assaulted women at Rio Hondo College.  I did not look into why he had a grand theft of labor charge for smashing a watch and then stealing the repairs from the guy who repaired the watch."

Shiga continued, "[I]f this suspect did do the arson, did you look into not only did he do this, [but] why did he do this?"  Ernst answered, "[M]y opinion based on the people I spoke to was that you had a problem with the Catholic Church or, specifically, priests doing bad things."  Shiga asked whether Ernst understood his behavior, adding, "we need to understand an individual to understand why he does certain things."  Ernst responded, "I [have] investigated a lot of crimes, and sometimes I agree with people's motives, but I don't like their methods."  Shiga agreed and stated, "[P]eople should not do anything that would be harmful to any other individuals."

Shiga continued, "Like you said, Greg Shiga . . . had interesting reasons for the things he did.  [¶]  Would you say you understood the things he did . . . or was he interesting because he did things of a reason of a different matter?"  The prosecutor objected as vague and compound, and the trial court rephrased the question, "When you were done with your investigation, did you believe that you understood the suspect Greg Shiga and his motives and reasons for allegedly committing the crime?"  Ernst answered, "[O]f all the crimes I investigate, I don't understand why people break the law . . . .  I understand people do it in society, but I don't understand, personally, why somebody would do that."  Shiga stated, "[W]e understand what people do, but the

21

important thing is the actual root of why someone would do certain things."

4.    *The defense case*

Shiga did not make an opening statement or closing argument, and rested without testifying or calling any witnesses.

5.    *Shiga's conviction and sentence*

On July 9, 2013 the jury convicted Shiga on all counts and found true all special allegations.[9]  Shiga did not submit a sentencing memorandum.  The only statement he made at his sentencing hearing was to note the date and time.

The trial court sentenced Shiga to an aggregate state prison term of 18 years to life.  The court sentenced Shiga on count 1 for aggravated arson to an indeterminate term of 10 years to life, plus an additional five years (upper term) for the enhancement under section 451.1, subdivision (a)(5), for use of an accelerant.  The court selected count 3 for possession of a flammable material as the base determinate term and imposed the upper term of three years.  On count 2 for arson of a structure, the court imposed and stayed (§ 654) the upper term of six years, plus four years for the enhancement under former section 12022.6, subdivision (a)(4), the upper term of five years on the enhancement under section 451.1, subdivision (a)(4), and the

---

[9]    The jury was not instructed and did not return a verdict on the special allegation as to count 1 that Shiga proximately caused multiple structures to burn (§ 451.1, subd. (a)(4)).  At sentencing the trial court noted the enhancement only applied to violations of section 451, not section 451.5.  On remand the trial court should dismiss the allegation.

22

upper term of five years for the enhancement under section 451.1, subdivision (a)(5), for a total of 20 years.[10]  On count 4 for second degree burglary, the court imposed and stayed the upper term of three years.  On count 5 for arson of an inhabited structure or property, the court imposed and stayed the upper term of eight years, plus the upper term of five years for the enhancement under section 451.1, subdivision (a)(5).

G.    *Appellate Proceedings**

In Shiga's first appeal we concluded the trial court "erred in failing to recognize it was within the court's discretion to conduct an inquiry to determine if defendant was mentally competent to represent himself and, if necessary, to deny the *Faretta* request." (*Shiga I, supra*, 6 Cal.App.5th at p. 42.)  We observed there was sufficient evidence before the trial court to raise a doubt about Shiga's mental competency to stand trial at the time of his *Faretta* hearing.  Thus, "the trial court's failure to recognize it was within its discretion to make further inquiry regarding whether such evidence was substantial and/or warranted ordering a second competency hearing was error."  (*Id.* at p. 44.)

We remanded for the trial court to determine the feasibility of assessing "whether [Shiga] was competent both to represent himself and to stand trial at the time of trial" in light of """""(1) [t]he passage of time, (2) the availability of contemporaneous medical evidence, including medical records and prior competency determinations, (3) any statements by the

---

[10]    The trial court's minute order following sentencing erroneously recorded the sentence on count 2 as 19 years.

*    See footnote, *ante*, page 1.

23

defendant in the trial record, and (4) the availability of individuals and trial witnesses, both experts and non-experts, who were in a position to interact with [the] defendant before and during trial.""""" (*Shiga I, supra*, 6 Cal.App.5th at p. 50.)

We instructed the trial court, if it found the retrospective determinations of competence were feasible, to perform "a fair evaluation of all of the available evidence" to determine whether Shiga "was mentally competent to represent himself at the time he was tried and [whether] he was mentally competent to stand trial." (*Shiga I, supra*, 6 Cal.App.5th at p. 50.) We deferred consideration of the remaining issues raised in Shiga's appeal. (*Ibid.*)

H.     *Proceedings on Remand*[11]*

1.     *The trial court's feasibility determination*

On remand, the People submitted the Department 95 reports of Drs. Stone, Knapke, and Sharma; an August 26, 2011 report of Dr. Rad, concluding Shiga was competent to stand trial in an earlier unrelated proceeding; minute orders and transcripts from Shiga's case showing his repeated failures to appear in court; and transcripts from Shiga's *Faretta* hearings. The People also submitted Shiga's medical records detailing treatment for schizophrenia by Dr. Koichi Ichikawa from 2002-2010. The trial court ordered Shiga's jail medical records and all transcripts from Shiga's trial court proceedings be provided to the court.

On May 30, 2017 the trial court held a hearing to decide the feasibility of retrospectively determining Shiga's competency.

---

[11]     Shiga was represented by counsel on remand.

*     See footnote, *ante*, page 1.

The court stated, "I am treating 'feasibility' as follows: That is the availability of sufficient evidence to reliably determine the defendant's mental competence when tried earlier." After hearing argument of counsel, the trial court found "a retrospective competency hearing is feasible to assess whether the defendant was competent both to represent himself and to stand trial at the time of trial . . . . [W]e are going to place the defendant in a position comparable to the one he would have been placed in prior to the original order . . . ." The court reserved its ability to decide at a later time the determination was not feasible if anticipated evidence proved to be unavailable or inadequate.

2. *Testimony regarding Shiga's competency*

In a series of hearings starting on July 10, 2017, the trial court heard testimony regarding Shiga's competency.

a. Shiga's Sister

Shiga's sister, Michelle Shiga Mora, testified Shiga first showed signs of mental illness around age 18 or 19. Mora observed Shiga had spray painted the word "freedom" on his car. Around that time, Shiga was treated at a mental hospital. Later, Shiga began receiving treatment from a psychiatrist. At some point Shiga told Mora that "China" and "the government" knew who he was. Mora visited Shiga in jail, though she did not remember when. While in jail, Shiga told Mora he heard voices.

b. Anthony Cavalluzzi

Shiga called his former attorney, Alternate Public Defender Anthony Cavalluzzi, to testify. Cavalluzzi represented Shiga

25

from January 10, 2013, following Shiga's return from Department 95, until June 21, 2013, when the trial court granted Shiga's *Faretta* motion. Cavalluzzi paid attention to Shiga's mental state "because it is something we pay attention to when someone comes back from Department 95 [because] their competency may have been restored and then lost." Cavalluzzi did not recall Shiga's "condition really changing" after he returned from Department 95.

The trial court asked Cavalluzzi whether "throughout [his] entire representation of [Shiga]" he saw any "type of breakdown or decompensation . . . or any sort of psychic break . . . that would have led you to go to court and say, I have a doubt." Cavalluzzi had not. The court also inquired whether Cavalluzzi would have declared a doubt as to Shiga's competency to represent himself as of June 21, 2013 when Shiga's *Faretta* motion was granted. Cavalluzzi responded he would not have declared a doubt.

Cavalluzzi has previously told the court at Shiga's preliminary hearing, after Shiga failed to come to court, Shiga may be ready to proceed, but he was not "qualified" to represent himself. Cavalluzzi testified this statement did not mean Shiga was "not competent, just not qualified. Those are different things." Cavalluzzi explained, ". . . I don't think anyone is really qualified to represent themselves." Cavalluzzi testified he "didn't think [Shiga] had the necessary tools to represent himself" and Shiga did not understand legal concepts such as reasonable doubt or trial procedure. Cavalluzzi testified that of all his clients who requested to represent themselves during his 17 years as an attorney, he believed Shiga "was probably the least equipped to be able to represent himself."

26

Cavalluzzi discussed with Shiga prior to the preliminary hearing presentation of a not guilty by reason of insanity defense. Shiga refused to present any defense relying on his mental health. Cavalluzzi believed Shiga requested to represent himself because he did not want to waive time and wanted to go to trial as soon as possible.

c. Ivonne De La Cruz

Deputy Public Defender Ivonne De La Cruz was Shiga's attorney from after the arraignment until December 2012. Shiga frequently made requests of De La Cruz that were irrelevant to his case, and he appeared to be masturbating during videoconferences. In July 2012 De La Cruz had Shiga evaluated by Dr. Karim, who found Shiga not competent to stand trial.

A paralegal retained by De La Cruz reported to her Shiga did not want to undergo any further interviews because he did not want any reference to schizophrenia in his case. The paralegal also reported Shiga wanted to go to trial as soon as possible because he believed a jury would acquit him in light of his motivation to draw attention to the Catholic clergy's sexual abuse of minors. The paralegal obtained a 2011 report by Dr. Weiguo Zhu, who concluded Shiga was misdiagnosed as having schizophrenia, and he instead may suffer from a cocaine-induced disorder.

3. *Expert evidence regarding Shiga's competency*

a. Dr. Knapke's 2017 Reports

Dr. Knapke prepared a report dated August 9, 2017 based on his review of his 2012 report, Shiga's county jail medical records from February to August 2017, and his July 25, 2017

27

interview of Shiga.  Dr. Knapke concluded Shiga was psychiatrically stable at the time of the interview, and found no evidence of any mental illness or disorder at the time of trial that would have prevented him from representing himself.

Dr. Knapke described the interview as "unremarkable," similar to his December 2012 interview.  Shiga was interactive, made good eye contact, and gave logical, appropriate, and articulate answers.  "[H]is thought processes were linear and organized."  He denied auditory or visual hallucinations, but acknowledged sometimes believing people around him are "bad."  He elicited no symptoms of paranoia or psychosis.

During the interview, Shiga "claimed that during his trial . . . he believed that the judge in the courtroom was God.  He claimed that as a result, he did not speak during the course of his jury trial" because "the entire trial would work out in his favor."  Shiga claimed he did not cross-examine any witnesses.  He noted his sister bought him an "Express" brand suit for trial, which he believed was a message from God.  "[H]e believed the message was that he needed to have a very fast trial."  Dr. Knapke noted that in his previous report Shiga had been "insistent on having a speedy trial throughout the course of his legal predicament, but made no mention of any specific delusion of reference regarding his suit or any other delusional reason for having a speedy trial."  Dr. Knapke also noted Shiga "made no mention of God or any other religious delusions" in December 2012.

On November 1, 2017 Dr. Knapke issued a supplemental report, after reviewing Shiga's jail medical records from 2012 to 2013, records from Shiga's treatment by Dr. Ichikawa, and transcripts of the trial and pretrial *Faretta* proceedings.  Dr. Knapke reported a May 2013 progress note from mental

health clinicians at the jail showed Shiga was compliant with antidepressant medication, and no psychosis was noted. A jail psychiatry progress note dated January 5, 2013 documented Shiga's "thought processes at that time were mostly linear and there was no evidence of delusional thinking." Shiga stated he had heard voices only once, while in jail in 2009 at a time when he had not been sleeping. While in jail, Shiga "was resistant to taking an antipsychotic medication, stating [it] made him feel sedated." Dr. Knapke noted this would be a common effect of antipsychotic medication on someone without psychotic symptoms.

Dr. Knapke found no signs of psychotic symptoms, psychosis, or major mental illness from his review of the voir dire and trial transcripts. Dr. Knapke noted Shiga "appeared to be very articulate and presented himself very well during his court proceedings." Dr. Knapke concluded, "I do not see any clinical evidence that this defendant was suffering from any major mental illness that impaired his ability to represent himself during his trial."

Dr. Knapke filed a second supplemental report on January 7, 2018, documenting all the materials he had reviewed, including the jail medical records from around the time Shiga's *Faretta* motion was granted and the trial, Shiga's medical records from 2002 through 2010, transcripts from the pretrial proceedings and trial, and reports from the experts and paralegal. Dr. Knapke opined again Shiga was competent to stand trial and competent to represent himself at the time of his 2013 jury trial. Dr. Knapke noted as to the trial Shiga "had appropriate courtroom demeanor, was articulate and organized throughout the trial."

29

b.    Dr. Stone's 2017 Report

Dr. Stone interviewed Shiga and reviewed the same records Dr. Knapke reviewed for his second supplemental report, including Shiga's jail medical records from 2012 to 2013 and trial court transcripts.  Dr. Stone issued his report on December 2, 2017, concluding Shiga was both competent to stand trial and competent to represent himself.

Dr. Stone noted Shiga's jail medical records from August 31, 2012 stated he was "not hearing voices."  Another note from October 10, 2012 indicated Shiga was compliant with antipsychotic and antidepressant medications, although a note from November 19, 2012 showed some missed administrations of medication.  Dr. Stone identified a January 5, 2013 psychiatric progress note as "the most thorough entry" from the 2012 to 2013 time period.  The progress note stated Shiga at times "had odd relatedness" and a thought process that was "somewhat vague and perseverative," but "mostly linear."  According to the note, "Shiga reported that he had believed the government tried to influence him in the past, and later thought he was employed by the government."

During the interview, Shiga was "appropriately groomed" and "alert and oriented," with "spontaneous and fluent" speech.  Dr. Stone detected no delusions or mood lability.  Shiga "denied auditory hallucinations."  Dr. Stone noted that "[c]ompared to [his] August 2012 evaluation, [he] failed to find any evidence of thought disorder."

Dr. Stone interviewed Shiga in detail regarding his performance at trial.  He asked Shiga why he had refused to come to court on multiple occasions before his trial.  Shiga stated

30

he "didn't want to wait" in the holding tanks. When asked why he told the trial court he needed only one day to present his defense, Shiga responded, "I wanted a quick and speedy trial. I did not want to wait in the holding tank more than 4 hours every[]day." He explained the process of being transported to and from court was lengthy and gave him headaches. Dr. Stone also asked why Shiga did not request more time to review discovery, to which Shiga responded, "I didn't want to be in jail." In response to Dr. Stone's inquiry why Shiga objected to the request by his appointed investigator for more time to locate and subpoena potential witnesses, Shiga again explained he was "sick of waiting in the tanks for the court. It was unbearable."

Dr. Stone also questioned Shiga about his voir dire strategy, asking, "Can you recall some of the reasons you excused the first 9 jurors?" Shiga first stated he could not recall, then added, "I was trying to get prettier girls. All I saw at the time was men. I like girls. Something to look at."

Dr. Stone asked Shiga what his purpose was during cross-examination in asking Captain Ponder "how many breaths a person could take if exposed to such a fire as the one at St. John Vianney's." Shiga responded, "Maybe the smoke?" Shiga then "very abruptly changed the conversation." He told Dr. Stone he had believed the judge was God during the trial, but added, "He definitely isn't God." Shiga stated, "I thought the jury would give me sympathy. I wasn't competent at the time." Shiga said he chose a speedy trial because of a suit, but "[i]n the same breath" repeated he chose a speedy trial to avoid spending more time in the holding tanks.

Dr. Stone opined that in the over 100 days between when he evaluated Shiga in August 2012 and Drs. Knapke and Sharma

found Shiga competent to stand trial in December 2012, "Shiga appears to have improved substantially over that time, through . . . medications, group therapy, absence of stimulants, and the mere structure of the jail milieu itself." Dr. Stone noted jail medical records reflected that during that period Shiga "was offered anti-psychotic medications" and was "actively participating" in group therapy for substance abuse. Further, the last entry in the jail treatment record before the December 2012 evaluations stated Shiga's "'thought process was linear' and 'no delusions [were] elicited.'" In addition, Shiga's "behavior [was] within normal range."[12]

Regarding Shiga's competency to represent himself, Dr. Stone opined "the strongest data, in my opinion, would have come from an assessment at the time. But, that opportunity having pas[sed], the second-best approach available would be to speak with Mr. Shiga directly about what he was thinking, and what his strategies and motivations were, to the best of his recollection, at the time he was in trial." Dr. Stone noted that forensic psychiatrists are often asked to form opinions about a person's prior mental state, including an evaluation of whether a defendant was not guilty by reason of insanity at the time of a crime. Dr. Stone found there was "considerable data" from his interview with Shiga and his review of the trial court transcripts to support his finding Shiga was competent to represent himself at the time of his trial.

---

[12] Dr. Stone also noted psychotic symptoms can improve over time with or without the aid of psychiatric medications. Further, highly intelligent patients, such as Shiga, could "'seal over' symptoms [of mental illness] on their own," whereas less intelligent individuals "may struggle longer to suppress them."

Dr. Stone opined "there is nothing remotely delusional" about Shiga's desire for a speedy trial to avoid "the discomfort and annoyance of waiting in 'holding tanks.'" Shiga similarly stated he declined psychological testing and moved quickly through jury selection to avoid more unpleasant trips back and forth to court. Further, Shiga had "voiced a belief only once that the judge was God, quite spontaneously, in a way that seemed intended to draw [Dr. Stone's] attention to it." "In the same breath, [Shiga] referred to a suit that made him choose a speedy trial," before quickly repeating his original reasons of avoiding the process of being transported to and from court. "Due to Mr. Shiga's own repeated statements, [Dr. Stone] formed the opinion that [Shiga's] alleged beliefs about the judge and suits were certainly not *predominant* reasons leading him to want a speedy trial, and also likely not credible ones." Dr. Stone also noted there was no reference to "Gods, nor suits, nor any delusional statements, nor any abnormal behaviors" at any point in the trial transcript.

Dr. Stone found the questioning by Shiga was "logical, rational, [and] even sophisticated," pointing to his questioning of Captain Ponder and Sergeant Yoshino about people collapsing from inhalation of toxic fumes. Dr. Stone believed "Shiga was raising some defense that investigators should have found his body there had he been the perpetrator." He likewise found the questioning of Cruz was logical in that he inquired how soon she obtained the evidence after the fire and whether she visited the site. Dr. Stone added, "There is simply no affirmative evidence of psychosis during the trial."

Dr. Stone concluded "within reasonable medical certain[ty], that by the time of his trial in June and July of 2013, the

33

defendant DID understand the nature of the proceedings before him," Shiga "WAS able to assist counsel in the conduct of his defense in a rational manner," and Shiga "WAS able to represent himself in pro per."

### 4. *The trial court's competency determinations*

On January 12, 2018 the trial court found Shiga was both competent to represent himself and competent to stand trial at the time of his trial. The trial court relied on Drs. Stone's and Knapke's 2017 reports, noting the doctors were "in complete agreement that the defendant was competent to represent himself."[13] The court found Shiga was "a highly intelligent motivated individual," and noted the sophistication of Shiga's crime, including his planning, research, and preparation. The court found Shiga's strategy at trial to try to elicit sympathy from the jury for his actions based on his motivation to bring attention to the Catholic clergy's sexual abuse of minors was "wrong," but not delusional.

The court found Shiga's failures to appear in court were motivated by his aversion to the transportation process and the holding cells, not a mental illness. The court likewise found Shiga's alleged hypersexuality while incarcerated in a men's jail was not evidence of a mental illness. The court stated its belief Shiga's statements about the judge being God and the significance of his sister bringing him a suit were malingering, citing to Dr. Stone's opinion these statements were "not credible."

---

[13] The trial court gave no weight to Dr. Karim's July 2012 report because the doctor "basically said, [Shiga is] mentally ill because he doesn't want to do what his defense lawyer wants to do."

34

Reflecting on its firsthand experience with Shiga during the trial, the court found Shiga possessed the necessary ability to represent himself. Shiga requested and utilized an investigator, made logical requests for redactions of the People's evidence, and possessed "an amazing grasp of the evidence in this case." Shiga asked appropriate questions during voir dire, requested the court excuse jurors for logical reasons, and made appropriate objections to introduction of evidence. The court agreed with Dr. Stone's conclusion Shiga asked relevant questions of Captain Ponder, Sergeant Yoshino, and Cruz relevant to his burning down of the church and the reliability of the evidence. The trial court concluded, "Throughout the trial, based on my own personal observations, which are confirmed by the transcripts in this case, there was absolutely nothing to indicate . . . the defendant was not capable of representing himself."

On April 9, 2018 we granted Shiga's motion to recall the remittitur and reinstate his notice of appeal.

## DISCUSSION

A.   *The Trial Court Did Not Abuse Its Discretion in Finding a Retrospective Determination of Shiga's Competency Was Feasible*[*]

Shiga contends the trial court erred in finding it was feasible retrospectively to determine his competency at the time of his trial. We conclude the trial court did not abuse its discretion in making this determination.

---

[*]   See footnote, *ante*, page 1.

A court may hold a retrospective competency hearing if it concludes there is "sufficient evidence on which a 'reasonable psychiatric judgment' of defendant's competence . . . can be reached." (*People v. Ary* (2004) 118 Cal.App.4th 1016, 1029; accord, *People v. Lightsey* (2012) 54 Cal.4th 668, 707 ["if it remains possible to give defendant that to which he was entitled at trial—a fair and reliable opportunity to prove his incompetence with the assistance of counsel—a remand to explore the feasibility of a retrospective hearing would appropriately tailor the remedy 'to the injury suffered from the . . . violation [without] unnecessarily infring[ing] on competing interests'"]; *Shiga I*, *supra*, 6 Cal.App.5th at p. 50 ["the court must determine if there is "'sufficient evidence to reliably determine . . . defendant's mental competence when tried earlier."'"].) We review a trial court's determination regarding the feasibility of a retrospective competency hearing for an abuse of discretion. (*Ary*, at p. 1029.)

In *Shiga I*, we directed the trial court to make its feasibility determination in light of "''''''(1) [t]he passage of time, (2) the availability of contemporaneous medical evidence, including medical records and prior competency determinations, (3) any statements by the defendant in the trial record, and (4) the availability of individuals and trial witnesses, both experts and non-experts, who were in a position to interact with [the] defendant before and during trial."''''''' (*Shiga I, supra*, 6 Cal.App.5th at p. 50, quoting *People v. Lightsey, supra*, 54 Cal.4th at p. 710.)

Although four years had passed since Shiga's trial, at the time of its feasibility determination the trial court had a substantial amount of contemporaneous medical evidence of

Shiga's competency. Shiga's competency was evaluated by Dr. Stone in August 2012 and by Drs. Knapke and Sharma in December 2012. The last two evaluations were performed less than six months before the trial in June 2013. Further, the trial court had Shiga's jail medical records from the time of trial. The court also had records of Shiga's medical treatment by Dr. Ichikawa from 2002 to 2010.

The trial court heard testimony about Shiga's mental state just before trial from Shiga's former attorney Cavalluzzi, who represented Shiga until the trial court granted Shiga's *Faretta* motion. Cavalluzzi noted in his testimony he was attentive to Shiga's mental state after Shiga returned from Department 95. In addition, because Shiga represented himself, the trial transcripts provided a substantial record of his statements and behavior at the time of trial. Further, although Drs. Stone and Knapke reevaluated Shiga four years after his trial, they both relied heavily on Shiga's jail medical records from the relevant period and the trial transcripts.[14] Dr. Stone opined there was "considerable data" on which to make a retrospective competency finding, likening the task to a retrospective assessment of a criminal defendant's sanity at the time of his or her offense, something forensic psychiatrists often do. Moreover, nothing in Dr. Knapke's report indicated he could not form a conclusion with

_____

[14] The trial court did not base its initial feasibility determination on future testimony by Cavalluzzi or the availability of supplemental reports from Drs. Knapke and Stone; however, the court made clear it would revisit its determination if the evidence proved to be inadequate during subsequent proceedings.

reasonable certainty about Shiga's competency at the time of trial due to the passage of time.

*In re Galaviz* (2018) 23 Cal.App.5th 491 (*Galaviz*), relied on by Shiga, is distinguishable. There, a doctor assessing the defendant's sanity at the time of his offense questioned his competency to stand trial, but the trial court failed to hold a competency hearing. (*Id.* at pp. 497-498.) Over 20 years after the defendant was found not guilty by reason of insanity and committed to a state hospital (*id.* at pp. 499-500), the Court of Appeal granted the defendant's petition for a writ of habeas corpus challenging the trial court's failure to hold a competency hearing (*id.* at pp. 506-507). The court concluded a retrospective competency determination was not feasible because 22 years had passed since the defendant's trial, the record lacked contemporaneous medical evidence, instead including only evaluations of his competency nine months before trial, the trial court record included no statements by the defendant at or near the time of trial, and the sole witness to the defendant's behavior at the time of trial was his attorney, who believed he was competent. (*Id.* at p. 511.)

In contrast to *Galaviz*, the trial court here had ample contemporaneous evidence of Shiga's mental state at trial, including Shiga's jail medical records, Cavalluzzi's testimony, the trial court's firsthand observations of Shiga during the trial, and the reports of Drs. Stone and Knapke, who were able to evaluate Shiga both in December 2012 and 2017. Accordingly, the trial court did not abuse its discretion in determining there was sufficient evidence upon which to make a retrospective competency finding. (*People v. Ary, supra*, 118 Cal.App.4th at p. 1029.)

38

B.      *Substantial Evidence Supports the Trial Court's Determination Shiga Was Competent To Represent Himself at the Time of Trial**

Shiga contends substantial evidence does not support the trial court's determination he was competent to represent himself at the time of his trial.  We conclude the evidence was sufficient.

"[A] trial court may exercise its discretion to deny self-representation where a defendant suffers from a severe mental illness such that he or she is unable to perform the basic tasks necessary to present a defense." (*People v. Mickel* (2016) 2 Cal.5th 181, 208 (*Mickel*); accord, *People v. Johnson* (2012) 53 Cal.4th 519, 530 (*Johnson*).)  "The trial court's determination regarding a defendant's competence must be upheld if supported by substantial evidence." (*Johnson*, at p. 531 [substantial evidence supported trial court's determination defendant was not competent to represent himself].)  "Such deference is especially appropriate when, as here, the same judge has observed the defendant on numerous occasions." (*Ibid.*; accord, *Edwards, supra*, 554 U.S. at p. 177 ["The trial judge, particularly one such as the trial judge in this case, who presided over one of Edwards' competency hearings and his two trials, will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant."].)

"The burden of proof in a retrospective hearing is on the defendant . . . ." (*People v. Rodas* (2018) 6 Cal.5th 219, 240; accord, *People v. Ary* (2011) 51 Cal.4th 510, 521 [defendant bears burden in retrospective competency hearing to prove his

---

*        See footnote, *ante*, page 1.

39

incompetence by a preponderance of the evidence].)  "A valid invocation of the right of self-representation 'remains the norm and may not be denied lightly.'"  (*People v. Miranda* (2015) 236 Cal.App.4th 978, 988 [trial court properly granted mentally ill defendant's *Faretta* motion]; *Johnson, supra*, 53 Cal.4th at p. 531 ["Trial courts must apply this standard [for denying self-representation based on mental incompetence] cautiously."].)

Substantial evidence supports the trial court's conclusion Shiga did not suffer from a severe mental illness such that he was unable to perform the basic tasks necessary to present a defense at the time of trial.  (*Mickel, supra*, 2 Cal.5th at p. 208; *Johnson, supra*, 53 Cal.4th at p. 530.)  As the trial court explained in finding Shiga competent to represent himself, "Throughout the trial, based on my own personal observations, which are confirmed by the transcripts in this case, there was absolutely nothing to indicate . . . the defendant was not capable of representing himself . . . ."  A trial "judge's own observations of the defendant's in-court behavior will . . . provide key support for an incompetence finding . . . ."  (*Johnson, supra*, 53 Cal.4th at p. 531; accord, *Mickel, supra*, 2 Cal.5th at p. 209 [noting "[t]he trial judge had the benefit of observing and interacting with defendant"].)

Shiga argues he was not competent to represent himself at trial because his denial of a mental illness led him to refuse to present a mental health defense.  As we stated in *Shiga I*, Shiga "vehemently opposed appointment of a mental health expert and asserted this opposition as his sole reason for seeking to waive counsel."  (*Shiga I, supra*, 6 Cal.App.5th at p. 44.)  At the *Faretta* hearing, the trial court explained to Shiga that defense counsel wanted a mental health expert to assess him for a report that

40

could assist his defense and possibly spare him a life sentence. Shiga said he understood he would not have the benefit of the report, but he "would like to go in a different way to defend this trial." But Shiga's objection to appointment of a mental health expert was also consistent with his repeated demand for a speedy trial. Shiga opposed his attorney's request for a continuance to obtain the mental health examination on this basis. Shiga's former attorney Cavalluzzi testified he believed Shiga requested to represent himself because he did not want to waive time and wanted to go to trial as soon as possible.

Neither a desire for a speedy trial nor a disagreement over defense strategy is necessarily indicative of mental illness, let alone severe mental illness inhibiting performance of the basic tasks necessary to present a defense, and both are among the most common reasons why a defendant might choose to exercise his or her right to self-representation. (See *Mickel, supra*, 2 Cal.5th at p. 209 ["[D]efendant's decision to present no defense—though ill-advised—was a valid exercise of his right to control his defense."]; *People v. Taylor* (2009) 47 Cal.4th 850, 865 [a self-represented defendant "convicted of a capital crime may legitimately choose a strategy aimed at obtaining a sentence of death"]; *People v. Miranda, supra*, 236 Cal.App.4th at p. 985 [trial court did not err in granting *Faretta* motion by defendant with mental health issues who objected to his attorney's request for a continuance and sought to represent himself to protect his right to a speedy trial].)

Shiga argues his attempted jury-nullification defense was itself evidence of delusion. But the mere fact a defendant desires to present a legal defense based on "fringe" beliefs that inspired the crime does not necessarily mean a defendant is not competent

41

to represent himself.  (*Mickel, supra*, 2 Cal.5th at p. 209.)  In *Mickel*, the defendant argued the trial court erred in granting his request to represent himself at trial for the murder of a police officer because he was mentally incompetent to do so.  (*Id.* at p. 204.)  The defendant had sought to present the defense the killing was a "'necessary' exercise of his 'right to defend liberty' and attempted to claim corporate immunity based on his decision to register as a corporation."  (*Id.* at p. 203.)  When the trial court refused to allow the defendant to present his liberty justification, the defendant "became 'very emotional' and opted, 'in protest,' not to present any evidence for his case during the guilt phase."  (*Ibid.*)  Relying on the trial court's assessment that the defendant had demonstrated his competency and skill in representing himself at trial, the Supreme Court rejected the defendant's argument of incompetence, reasoning "the mere fact that defendant held fringe political beliefs that inspired his murder of a police officer does not render him incompetent to represent himself."  (*Id.* at p. 209.)

While "[j]ury nullification is contrary to our ideal of equal justice for all" (*People v. Williams* (2001) 25 Cal.4th 441, 463), such a defense strategy is far from strong evidence of mental incompetence.  (Cf. *People v. Rodas*, *supra*, 6 Cal.5th at p. 232 [substantial evidence of mental incompetence during trial existed regarding defendant who communicated incoherently to his counsel and asserted "paranoid theory that the videotapes the prosecution was using against him were 'assimilations'"]; *People v. Murdoch* (2011) 194 Cal.App.4th 230, 234-235, 238 [substantial evidence of mental incompetence during trial existed regarding self-represented defendant who presented defense that assault victim was an angel rather than a human being].)

Shiga also argues his failure adequately to present his defense demonstrates his incompetence. Indeed, in *Shiga I* we observed his "defense was virtually nonexistent." (*Shiga I, supra*, 6 Cal.App.5th at p. 41.) But the question before us is not whether Shiga represented himself well, but whether there is substantial evidence to support the trial court's conclusion Shiga was competent to perform the basic tasks of self-representation at the time of trial. The Sixth Amendment protects a defendant's right to represent himself, "although he may conduct his own defense ultimately to his own detriment." (*Faretta, supra*, 422 U.S. 806, 834; accord, *Mickel, supra*, 2 Cal.5th at p. 206 ["We have . . . rejected claims that the fact or likelihood that an unskilled, self-represented defendant will perform poorly in conducting his or her own defense must defeat the *Faretta* right."]; *People v. Butler* (2009) 47 Cal.4th 814, 824-825, 828 ["Defendants untrained in the law may well provide themselves with inept representation."].) The "basic tasks" necessary for a defense include "organization of defense, making motions, arguing points of law, participating in *voir dire*, questioning witnesses, and addressing the court and jury." (*Edwards, supra*, 554 U.S. at pp. 175-176, citing *McKaskle v. Wiggins* (1984) 465 U.S. 168, 174.)

Shiga was cooperative and respectful during all trial proceedings. He actively participated in jury selection. After Shiga exercised his first nine peremptory challenges, the trial court observed Shiga was doing "a fine job." Shiga's questioning and requests to excuse jurors based on their education, background, understanding of English, and experience with similar crimes were both logical and reasonable. Shiga contends his statement to Dr. Stone that he excused certain jurors "to get

43

prettier girls" on the jury undermines the trial court's positive assessment of his performance. But even if Shiga was motivated in part by this purpose, his conduct during jury selection demonstrates consideration of and attentiveness to the process.

While Shiga made no opening statement or closing argument and called no witnesses, he did make use of cross-examination to raise his theory the jury should not convict him because he acted for good reasons and did not intend to hurt anyone. During his questioning of FBI Special Agent Ernst, Shiga attempted to establish he was not dangerous by asking whether Ernst had investigated "why" Shiga had burned the church. Ernst responded, "[M]y opinion based on the people I spoke to was that you had a problem with the Catholic Church or, specifically, priests doing bad things." Later in Ernst's cross-examination, Shiga opined that "[p]eople should not do anything that would be harmful to any other individuals" and "the important thing is the actual root of why someone would do certain things." Shiga's decision to allow Ernst to testify as to his criminal history, although misguided, appears to have been an attempt to show the jury he was not dangerous, but rather, had good reasons to do what he did.

During trial Shiga also attempted to cast doubt on the evidence against him. Shiga questioned criminalist Cruz about the chain of custody of the evidence she analyzed, her qualifications, and her relationship with the prosecutor, although Cruz's responses were mostly not helpful to him. Through his cross-examination of Captain Ponder, Shiga also attempted to suggest the actual arsonist would have been found dead or unconscious at the scene of the fire due to inhalation of smoke.

44

Shiga successfully sought to shield himself from juror prejudice by requesting all references to his parole status be redacted from his conversations with the undercover officer posing as his cellmate and objecting to a photograph showing him in handcuffs.  The trial court agreed with Shiga on both points.  Shiga's attention to detail on these evidentiary matters is consistent with the competence necessary to organize and present a defense.

As the trial court found prior to sentencing Shiga, "Mr. Shiga was in charge of his defense in this case.  He made decisions for himself.  He frankly, I believe, was fully aware of what was going on.  He had meaningful off-the-record conversations with the D.A., Ms. Rose.  Many times you asked, Mr. Shiga, to go off the record.  You discussed with the D.A. evidence.  You discussed with her some of the photos.  You discussed with her disposition of evidence, which witnesses she was calling, what order she was calling them in.  [¶]  I observed this myself.  You were clearly aware of the evidence. . . . [¶] . . . [¶] . . . You had and made arrangements with your investigator. . . .  You comported yourself extremely well during this trial. . . .  [¶] . . . [¶] . . . I observed your demeanor, your attitude, the quality of your knowledge of the facts, most of which, at your choice, were exhibited, frankly, outside the presence of the jury.  [¶] . . . [¶] [F]rankly, you had a better grasp of the facts of the case and the law that pertained to your case than most pro per defendants I have seen in my career."

This is not to say Shiga's performance was irreproachable.  He made irrelevant inquires of witnesses and declined to question important witnesses altogether.  As noted, he failed to make an opening statement or closing argument.  But

45

significantly, Shiga has not identified any statement or behavior from his trial demonstrating his "'[d]isorganized thinking, deficits in sustaining attention and concentration, impaired expressive abilities, anxiety, [or] other common symptoms of severe mental illnesses.'" (*Edwards, supra*, 554 U.S. at p. 176; accord, *Johnson, supra*, 53 Cal.4th at p. 532 [upholding trial court's revocation of defendant's self-representation status where he filed numerous "'nonsensical motions'" and conducted himself during proceedings in "'a bizarre and disruptive manner'"].)

The trial court's assessment of Shiga's competency to represent himself at the time of his trial is also confirmed by the 2017 reports of Drs. Knapke and Stone. Dr. Stone, who had previously opined Shiga was not competent to stand trial, after assessing the trial transcripts, reviewing Shiga's jail medical records, and interviewing Shiga at length regarding the trial, concluded "within reasonable medical certain[ty]" Shiga was competent at the time of trial both to represent himself and to stand trial. Dr. Stone noted Shiga's jail records from the time of his trial show he received antipsychotic medications and participated in group therapy, with "behavior within normal range." Dr. Stone specifically opined "there is nothing remotely delusional" about Shiga's desire for a speedy trial to avoid "the discomfort and annoyance of waiting in 'holding tanks,'" and found Shiga's claims he had believed the trial judge was God and his suit was compelling him to choose a speedy trial were "likely not credible."

Dr. Knapke reached a similar conclusion, finding Shiga "had appropriate courtroom demeanor, [and] was articulate and organized throughout the trial." Dr. Knapke "[did] not see any clinical evidence that [Shiga] was suffering from any major

46

mental illness that impaired his ability to represent himself during his trial."

The trial court credited both reports, including Dr. Stone's view Shiga's statements about believing the trial judge was God were not credible. The court also found Shiga's claim the suit he wore at trial compelled him to choose a speedy trial was similarly not credible because Shiga had indicated to the undercover officer shortly after Shiga's arrest that he wanted a speedy trial. The testimony of Shiga's sister, the records of Shiga's treatment by Dr. Ishikawa, and the report of Dr. Karim could have lent support to a finding of incompetency, but "[i]f the trier of fact's findings are reasonably justified under the circumstances, the opinion of the reviewing court that the circumstances may also be reconciled with a contrary finding does not warrant reversal of the judgment." (*People v. Fleming* (2018) 25 Cal.App.5th 783, 788; accord, *People v. Casares* (2016) 62 Cal.4th 808, 823.)

C.    *Substantial Evidence Supports the Trial Court's Determination Shiga Was Competent To Stand Trial at the Time of Trial**

Shiga also contends substantial evidence does not support the trial court's determination he was competent to stand trial at the time of his trial. Competency for self-representation is governed by a "higher standard" than competency to stand trial. (*Johnson, supra*, 53 Cal.4th at p. 523.) Because we conclude substantial evidence supports the trial court's determination Shiga was competent to represent himself at the time of his trial, we also necessarily conclude substantial evidence supports the

---

\*    See footnote, *ante*, page 1.

47

trial court's determination he was competent to stand trial at that time.

D.    *Arson Is Not a Lesser Included Offense of Aggravated Arson, But Shiga Was Improperly Convicted of Two Forms of Arson*

Shiga contends his convictions for arson of an inhabited structure and arson of a structure under section 451, subdivisions (b) and (c), respectively, must be reversed because the offenses are lesser included offenses of aggravated arson under section 451.5.[15] This contention lacks merit. But Shiga was improperly convicted of two counts of arson under section 451, subdivisions (b) and (c), because section 451 defines a single crime of simple arson.

1.    *Arson is a single offense that may be committed in different ways*

In support of his contention arson is a single offense, Shiga points to the language at the beginning of section 451, which

---

[15] Former section 451.5, subdivision (a), provided, "Any person who willfully, maliciously, deliberately, with premeditation, and with intent to cause injury to one or more persons or to cause damage to property under circumstances likely to produce injury to one or more persons or to cause damage to one or more structures or inhabited dwellings, sets fire to, burns, or causes to be burned, or aids, counsels, or procures the burning of any residence, structure, forest land, or property is guilty of aggravated arson if one or more" of three enumerated aggravating factors exists. The Legislature amended section 451.5, effective January 1, 2019. However, the amendments are not relevant to this appeal.

provides, "A person is guilty of arson when he or she willfully and maliciously sets fire to or burns or causes to be burned or who aids, counsels, or procures the burning of, any structure, forest land, or property."[16]  The People contend arson is not a single offense, but rather, each subdivision creates a separate offense, including section 451, subdivision (b), which criminalizes "[a]rson that causes an inhabited structure or inhabited property to burn," and section 451, subdivision (c), which criminalizes "[a]rson of a structure or forest land."

To determine whether the subdivisions of section 451 set forth separate offenses or different ways of committing the same offense of simple arson, we look to the Legislature's intent as reflected in the language of the statute and, if the language permits more than one reasonable interpretation, we consider the legislative history.  (*People v. Gonzalez* (2014) 60 Cal.4th 533,

---

[16]    Section 451 provides in full, "A person is guilty of arson when he or she willfully and maliciously sets fire to or burns or causes to be burned or who aids, counsels, or procures the burning of, any structure, forest land, or property.  [¶]  (a) Arson that causes great bodily injury is a felony punishable by imprisonment in the state prison for five, seven, or nine years.  [¶]  (b) Arson that causes an inhabited structure or inhabited property to burn is a felony punishable by imprisonment in the state prison for three, five, or eight years.  [¶]  (c) Arson of a structure or forest land is a felony punishable by imprisonment in the state prison for two, four, or six years.  [¶]  (d) Arson of property is a felony punishable by imprisonment in the state prison for 16 months, two, or three years.  For purposes of this paragraph, arson of property does not include one burning or causing to be burned his or her own personal property unless there is an intent to defraud or there is injury to another person or another person's structure, forest land, or property."

537, 539 (*Gonzalez*) [concluding oral copulation under former § 288a, subd. (f), prohibiting oral copulation of an unconscious person, and subd. (i), prohibiting oral copulation of an intoxicated person, describe separate offenses because "[e]ach subdivision sets forth all the elements of a crime, and each prescribes a specific punishment"]; see *People v. White* (2017) 2 Cal.5th 349, 351-352 (*White*) [considering legislative intent in concluding § 261, subd. (a)(3), prohibiting rape of intoxicated person, and (a)(4)(A), prohibiting rape of unconscious person, described separate offenses such that defendant may properly be convicted of both in the same proceeding]; *People v. Vidana* (2016) 1 Cal.5th 632, 650 (*Vidana*) [relying on legislative history to conclude larceny under § 484, subd. (a), and embezzlement under § 503 are "different statements of the same offense"].)

As the *Gonzalez* court explained as to the defendant's multiple convictions for oral copulation, "It follows that the determination whether subdivisions (f) and (i) of [former] section 288a define different offenses or merely describe different ways of committing the same offense properly turns on the Legislature's intent in enacting these provisions, and if the Legislature meant to define only one offense, we may not turn it into two." (*Gonzalez, supra*, 60 Cal.4th at p. 537.) To make this determination, ""[w]e begin by examining the statute's words, giving them a plain and commonsense meaning. [Citation.] We do not, however, consider the statutory language 'in isolation.' [Citation.] Rather, we look to 'the entire substance of the statute . . . in order to determine the scope and purpose of the provision . . . . [Citation.]' [Citation.] That is, we construe the words in question "'in context, keeping in mind the nature and obvious purpose of the statute . . . ." [Citation.]' [Citation.] We

50

must harmonize 'the various parts of a statutory enactment . . . by considering the particular clause or section in the context of the statutory framework as a whole.'"' [Citation.] 'If, however, the statutory language is susceptible of more than one reasonable construction, we can look to legislative history in aid of ascertaining legislative intent.'" (*Id.* at pp. 537-538.)

The Supreme Court in *Vidana, supra*, 1 Cal.5th at page 648, in considering whether larceny under section 484, subdivision (a), and embezzlement under section 503 are separate offenses, first noted the two sections have different elements and neither is a lesser included offense of the other. Further, each section defines the elements of the offense, and thus under *Gonzalez* the sections are "self-contained." (*Vidana*, at p. 648.) However, the court found the statutory scheme ambiguous because section 484, subdivision (a), also proscribes embezzlement. (*Vidana*, at p. 648.) Accordingly, the court looked to the legislative history, and concluded it showed the Legislature intended to create a single offense of theft, noting the 1927 amendment to section 484 "'consolidate[d] the present crimes known as larceny, embezzlement and obtaining property under false pretenses, into one crime, designated as theft.'" (*Vidana*, at p. 648.)

Here, in contrast to former section 288a at issue in *Gonzalez*, which sets forth the complete elements of each crime of oral copulation in the section's subdivisions,[17] the first sentence

---

[17] Former section 288a, subdivision (a), defines "oral copulation" as the "act of copulating the mouth of one person with the sexual organ or anus of another person." But a person does not commit a crime if the conduct is performed with a consenting adult. Rather, the subdivisions provide the elements of the

51

of section 451 defines the crime of arson, applicable to all subdivisions, whereas the subdivisions specify the applicable penalties depending on the severity of the injury.  For example, section 451, subdivision (a), provides that "[a]rson that causes great bodily injury is a felony punishable by imprisonment in the state prison for five, seven, or nine years."  (See § 451, subds. (b) [arson of inhabited structure or property punishable by three, five, or eight years], (c) [arson of a structure or forest land punishable by two, four, or six years], (d) [arson of property with specific exceptions punishable by 16 months or two or three years].)

Further, under the People's theory that each subdivision is a separate offense, an arsonist could be punished for multiple offenses for lighting a single fire that burns an inhabited structure (§ 451, subd. (b)) and an uninhabited structure (§ 451, subd. (c)).  But this would be inconsistent with section 451.1, subdivision (a)(4), which imposes a sentence enhancement where

---

crime, including, in addition to subdivisions (f) (oral copulation with unconscious person) and (i) (oral copulation with intoxicated person), oral copulation with a person under 18 years of age (former § 288a, subd. (b)(1)) and oral copulation "accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person" (former § 288a, subd. (c)(2)(A)).  Similarly, section 261, subdivision (a), at issue in *White*, defines "[r]ape" as "an act of sexual intercourse accomplished with a person not the spouse of the perpetrator."  But not all sexual intercourse with a person other than a spouse is rape.  Rather, the subdivisions provide the elements of the crime of rape, including sexual intercourse where a person is intoxicated (§ 261, subd. (a)(3)) or unconscious (§ 261, subd. (a)(4)).

the arsonist causes more than one structure to burn.  (§ 451.1, subd. (a)(4) ["[A]ny person who is convicted of a felony violation of Section 451 shall be punished by a three-, four-, or five-year enhancement if one or more of the following circumstances is found to be true:  [¶]  . . .  [¶]  (4) The defendant proximately caused multiple structures to burn in any single violation of Section 451."].)

The legislative history also supports an interpretation of section 451 as criminalizing a single offense of simple arson.  In 1979 Senate Bill No. 116 reorganized and consolidated multiple Penal Code sections relating to different forms of arson into section 451.[18]  (*People v. Atkins* (2001) 25 Cal.4th 76, 87, citing Stats. 1979, ch. 145, §§ 1-3, 7 & 8.)  The bill repealed former sections 447a (burning of a trailer coach or various dwellings), 448a (burning of barns, stables, public bridges, and other buildings), 449a (burning of vehicles, specified farm goods, and other personal property), 449b (burning of specified farm goods, railroad ties, phone poles, bridges, and other structures), 449c (burning of forest land, grain, and other property), 450a (arson with intent to defraud the insurer), 451a (attempted arson), and 451b (setting a fire in a detention facility).  (Stats. 1979, ch. 145, §§ 1-5, 7 & 10.)

Notably, as the comments to the Senate Committee on Judiciary on Senate Bill No. 116 state, "Under this bill, a person would be guilty of arson when he [or she]  [¶]  'willfully and maliciously sets fire to or burns or causes to be burned or who

---

[18]  Senate Bill No. 116 also created a new crime of "'unlawfully causing a fire,'" codified in section 452.  (Sen. Com. on Judiciary, Analysis on Sen. Bill No. 116 (1979-1980 Reg. Sess.) as amended Feb. 12, 1978, p. 2.)

aids, counsels, or procures the burning of, any structure, forest land or property.'" (See Sen. Com. on Judiciary, Analysis on Sen. Bill No. 116 (1979-1980 Reg. Sess.) as amended Feb. 12, 1978, p. 2, underscoring omitted.) Further, treatment of section 451's subdivisions as sentencing provisions is consistent with Senate Bill No. 116's amendment of section 12022.7, which provides a sentence enhancement for offenses in which the defendant personally inflicted great bodily injury, to exclude arson (see § 12022.7, subd. (g)), and the addition of the enhancement in section 451, subdivision (a), which does not require intent to cause great bodily injury. (See Sen. Com. on Judiciary, Analysis on Sen. Bill No. 116, at p. 5.) This change reflected the Legislature's intent to "raise the sentences for arson, depending upon the end result of the burning." (*Id.* at p. 3, underscoring omitted.)

We recognize our colleagues in the First Appellate District recently addressed a similar issue in concluding section 452, subdivision (b), for recklessly causing a fire to an inhabited structure or property, and subdivision (c), for recklessly causing a fire to a structure or forest land, defined separate offenses.[19]

---

[19] Section 452 tracks the language of section 451, and provides, "A person is guilty of unlawfully causing a fire when he [or she] recklessly sets fire to or burns or causes to be burned, any structure, forest land or property. [¶] (a) Unlawfully causing a fire that causes great bodily injury is a felony punishable by imprisonment in the state prison for two, four or six years, or by imprisonment in the county jail for not more than one year, or by a fine, or by both such imprisonment and fine. [¶] (b) Unlawfully causing a fire that causes an inhabited structure or inhabited property to burn is a felony punishable by imprisonment in the state prison for two, three or four years, or by imprisonment in

54

(*People v. Corrigan* (Apr. 8, 2019, A154051) __ Cal.App.5th __
[2019 WL 1513202, *6] (*Corrigan*).) The *Corrigan* court relied on
the Supreme Court's opinion in *White, supra*, 2 Cal.5th at page
357, to support its holding, noting the Supreme Court did not find
"dispositive" that the subdivisions of section 261, defining rape,
did not provide a "self-contained" definition of rape. (*Corrigan*, at
p. *5.) But the arson statute differs from both the rape statute at
issue in *White* and the oral copulation statute at issue in
*Gonzalez, supra*, 60 Cal.4th at pages 537, 539, in that section
451, without consideration of its subdivisions, sets forth the
complete elements of the crime of arson; former section 288a,
subdivision (a) (oral copulation), and section 261, subdivision (a)
(rape), do not. Rather, the subdivisions of the sex offense
statutes provide the elements necessary to make the sexual
conduct a crime.[20] Further, the court in *Corrigan* did not look at

---

the county jail for not more than one year, or by a fine, or by both
such imprisonment and fine. [¶] (c) Unlawfully causing a fire of
a structure or forest land is a felony punishable by imprisonment
in the state prison for 16 months, two or three years, or by
imprisonment in the county jail for not more than six months, or
by a fine, or by both such imprisonment and fine. [¶]
(d) Unlawfully causing a fire of property is a misdemeanor. For
purposes of this paragraph, unlawfully causing a fire of property
does not include one burning or causing to be burned his own
personal property unless there is injury to another person or to
another person's structure, forest land or property. . . ."

[20] The court in *Corrigan* also relies on *In re Jonathan R.*
(2016) 3 Cal.App.5th 963, 971, in which the Court of Appeal
concluded section 245, subdivision (a)(1) and (4), created separate
offenses of assault with a deadly weapon and assault by means of
force likely to produce great bodily injury, respectively, because
under *Gonzalez* each subdivision stated the elements of the

55

the "'statutory framework as a whole'" or legislative history in concluding section 452 defined separate offenses of unlawfully causing a fire.  (See *Vidana, supra*, 1 Cal.5th at pp. 637, 648; *Gonzalez*, at pp. 537-538.)  We have the benefit of both.

We conclude, in light of the statutory language in sections 451 and 451.1 and section 451's legislative history, section 451 criminalizes a single offense of arson.  (See *In re V.V.* (2011) 51 Cal.4th 1020, 1027 [a person commits arson when he or she "'willfully and maliciously sets fire to or burns or causes to be burned . . . any structure, forest land, or property'"]; *People v. Cole* (2004) 33 Cal.4th 1158, 1218 [trial court did not err in failing to instruct jury on offense of unlawfully setting a fire where defendant had argued it was lesser included offense of arson, explaining that "[a] person is guilty of arson when he 'willfully and maliciously sets fire to or burns . . . any structure . . . or property,'" but is guilty of unlawfully causing a fire when he 'recklessly'" sets the fire under § 452].)

---

offense.  (*Corrigan, supra*, __ Cal.App.5th at p. __ [2019 WL 1513202, *5].)  But the Court of Appeal in *People v. Brunton* (2018) 23 Cal.App.5th 1097 declined to follow *In re Jonathan R.*, noting the Supreme Court's holding in *Vidana* supported consideration of the legislative history, which the *Brunton* court concluded supported its holding the Legislature did not intend by its 2011 amendment to section 245 to create two separate offenses of aggravated assault.  (*Brunton*, at pp. 1106-1107.)  We likewise follow *Vidana* and conclude the legislative history and statutory scheme show the Legislature intended to create a single offense of simple arson.

2. *Shiga was improperly convicted of two forms of the single offense of arson*

Section 954 provides, "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts . . . . The prosecution is not required to elect between the different offenses or counts set forth in the accusatory pleading, but the defendant may be convicted of any number of the offenses charged. . . ." "'The most reasonable construction of the language in section 954 is that the statute authorizes multiple convictions for different or distinct offenses, but does not permit multiple convictions for a different statement of the same offense when it is based on the same act or course of conduct.'" (*Vidana, supra*, 1 Cal.5th at p. 650 [defendant could not be convicted of both grand theft by larceny and embezzlement based on the same course of conduct]; accord, *Wilkoff v. Superior Court* (1985) 38 Cal.3d 345, 349 ["[A] charge of multiple counts of violating a statute is appropriate only where the actus reus prohibited by the statute—the gravamen of the offense—has been committed more than once."]; *People v. Coyle* (2009) 178 Cal.App.4th 209, 217 [invalidating three murder convictions for killing one person, where the "three counts simply alleged alternative theories of the offense"]; cf. *White, supra*, 2 Cal.5th at p. 352 ["'[T]he two statutory subdivisions at issue here describe different offenses, and defendant may properly be convicted of, although not punished for, both.'"].)

Because section 451 criminalizes a single offense of arson, under section 954 Shiga could not be convicted of both arson of an inhabited structure under section 451, subdivision (b), and arson

of a structure under section 451, subdivision (c). Rather, the convictions are based on a single actus reus, of Shiga setting a fire in the church with a tiki torch. The People argue that because the fire spread and burned the rectory, a separate structure, he may properly be convicted of two counts of arson. We disagree. Arson can be accomplished by indirectly causing a structure, forest land, or property to burn. (See *In re V.V., supra*, 51 Cal.4th at p. 1024 [upholding juvenile court's determination minors committed arson by throwing lit firecracker into brush-covered hillside, causing a five-acre brush fire]; *People v. Hiltel* (1901) 131 Cal. 577, 579-580 [defendant properly convicted for causing dwelling to burn where fire spread from a fire set in the wine cellar that was not the basis of the charge].) But it does not follow that a defendant is subject to multiple convictions for a single act if the fire burns multiple structures or pieces of property. To conclude otherwise would allow the arsonist who burns one home to be subject to a separate conviction for each piece of personal property burned inside the home.[21] Our conclusion is bolstered by the Legislature's enactment of an enhanced sentence in section 451.1, subdivision (a)(4), for an arson conviction where a defendant has proximately caused multiple structures to burn "in any single violation of Section 451."

We reverse Shiga's arson convictions on counts 2 and 5. On remand the People should elect whether to proceed on count 2 under section 451, subdivision (c), or on count 5 under section

---

[21]     Section 450, subdivision (c), defines "property" to include "real property or personal property, other than a structure or forest land."

451, subdivision (b).  The trial court should then reinstate Shiga's conviction on the count elected by the People.

### 3. *Arson of a structure and arson of an inhabited structure are not lesser included offenses of aggravated arson*

"'[I]t is generally permissible to convict a defendant of multiple charges arising from a single act or course of conduct.  [Citations.]  However, a "judicially created exception to this rule prohibits multiple convictions based on necessarily included offenses."'" (*People v. Delgado* (2017) 2 Cal.5th 544, 570, italics omitted (*Delgado*); accord, *People v. Cady* (2016) 7 Cal.App.5th 134, 139-140 (*Cady*).)  "When a defendant is found guilty of both a greater and a necessarily lesser included offense arising out of the same act or course of conduct, and the evidence supports the verdict on the greater offense, that conviction is controlling, and the conviction of the lesser offense must be reversed." (*People v. Sanders* (2012) 55 Cal.4th 731, 736; accord, *Cady*, at pp. 139-140.)

"'In deciding whether multiple conviction is proper, a court should consider only the statutory elements.' [Citation.]  'Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former.' [Citation.]  In other words, '"[i]f a crime cannot be committed without also necessarily committing a lesser offense, the latter is a lesser included offense within the former."'" (*Delgado, supra*, 2 Cal.5th at p. 570; accord, *Cady, supra*, 7 Cal.App.5th at p. 140.)  "This determination is made in the abstract . . . .  The evidence introduced at trial is

irrelevant to this determination." (*People v. Chaney* (2005) 131 Cal.App.4th 253, 256.)

As the Court of Appeal in *Cady* reasoned, there are some scenarios under which "a defendant convicted of violating [Vehicle Code] section 23153, subdivision (f) by driving under the combined influence of alcohol and drugs would not have consumed enough alcohol to cause impairment had the alcohol been consumed by itself." (*Cady, supra*, 7 Cal.App.5th at p. 143.) Thus, "[b]ecause a person does not necessarily violate [Vehicle Code section] 23153, subdivision (a) when he or she violates [section] 23153, subdivision (f), we conclude under the elements test that the crime of driving under the influence of alcohol causing injury [citation] is not a lesser included offense of the crime of driving under the combined influence of alcohol and a drug causing injury [citation]." (*Cady*, at p. 144.)

A person commits aggravated arson under section 451.5, subdivision (a), if he or she burns "any residence, structure, forest land, or property." As discussed, section 450, subdivision (c), defines "property" to include both real and personal property. As to simple arson, however, section 451, subdivision (d), provides that "arson of property does not include one burning or causing to be burned his or her own personal property unless there is an intent to defraud or there is injury to another person or another person's structure, forest land, or property." Thus, a defendant can commit aggravated arson by burning his or her own personal property with the intent to cause injury to a person or to property under circumstances likely to injure a person as set forth in section 451.5, without necessarily committing arson under section 451, if the defendant does not intend to defraud and the arson does not actually cause injury to another person or another

60

person's structure, forest land, or property. Therefore, the offense of arson under section 451 is not a lesser included offense of aggravated arson. (*Delgado, supra*, 2 Cal.5th at p. 570; *Cady, supra*, 7 Cal.App.5th at p. 140.)[22]

E. *The Repeal of Former Section 12022.6 Does Not Apply Retroactively**

Shiga contends we should strike the enhancement the trial court imposed on count 2 pursuant to former section 12022.6, subdivision (a)(4),[23] because the Legislature repealed the section,

---

[22] Shiga also relies on the language in *People v. Muszynski* (2002) 100 Cal.App.4th 672, 684, that "simple arson under section 451, which involves the willful and malicious burning of any structure, is a lesser included offense of aggravated arson . . . ." However, *Muszynski* did not involve a determination of whether the defendant could be convicted of both aggravated arson under section 451.5 and arson under section 451. Rather, after the court concluded insufficient evidence supported the defendant's conviction of aggravated arson under section 451.5, subdivision (a)(3), for causing damage to five or more inhabited structures, because the jury had been instructed that simple arson was a lesser included offense, the court "reduce[d] defendant's conviction to arson causing great bodily injury, a lesser included offense." (*Muszynski*, at p. 684.) Notably, the *Muszynski* court did not analyze the relationship between sections 451 and 451.5 under the elements test applicable here. To the extent *Muszynski* can be read to bar a conviction for section 451 as a lesser included offense of aggravated arson, we disagree with our colleagues in the Sixth Appellate District.

* See footnote, *ante*, page 1.

[23] Former section 12022.6, subdivision (a)(4), provided: "When any person takes, damages, or destroys any property in

---

effective January 1, 2018, and as of that date his case was still pending on appeal.  The People respond that under the Supreme Court's decision in *In re Pedro T.* (1994) 8 Cal.4th 1041 (*Pedro T.*), the presence of a sunset provision in former section 12022.6 shows the Legislature's intent the repeal not apply retroactively.  We agree with the People.

At the time Shiga was convicted, former section 12022.6, subdivision (a)(4), provided that "[i]f the loss exceeds three million two hundred thousand dollars ($3,200,000), the court, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which the defendant has been convicted, shall impose an additional term of four years."  As noted by Shiga, on January 1, 2018 former section 12022.6 was repealed by its own terms pursuant to former section 12022.6, subdivision (f), which provided, "It is the intent of the Legislature that the provisions of this section be reviewed within 10 years to consider the effects of inflation on the additional terms imposed.  For that reason this section shall remain in effect only until January 1, 2018, and as of that date is repealed unless a later enacted statute, which is enacted before January 1, 2018, deletes or extends that date."  Former section 12022.6 had no saving

---

the commission or attempted commission of a felony, with the intent to cause that taking, damage, or destruction, the court shall impose an additional term as follows:  [¶]  . . .  [¶]  . . . If the loss exceeds three million two hundred thousand dollars ($3,200,000), the court, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which the defendant has been convicted, shall impose an additional term of four years."

clause limiting the scope of the repeal.  Further, the Legislature has not enacted a new version of section 12022.6.

Shiga urges us to strike the enhancement pursuant to *In re Estrada*, which held that when the Legislature amends a statute to lessen the punishment, in the absence of a saving clause, "[t]he amendatory act imposing the lighter punishment can be applied constitutionally to acts committed before its passage provided the judgment convicting the defendant of the act is not final." (*In re Estrada* (1965) 63 Cal.2d 740, 745, 747 (*Estrada*).)  However, in *Pedro T.*, the Supreme Court distinguished its earlier holding in *Estrada* with respect to a Vehicle Code sentencing provision with a sunset clause, explaining, "We believe the very nature of a sunset clause, as an experiment in enhanced penalties, establishes—in the absence of evidence of a contrary legislative purpose—a legislative intent the enhanced punishment apply to offenses committed throughout its effective period." (*Pedro T., supra*, 8 Cal.4th at p. 1049.)  The court concluded in light of the sunset provision, the Legislature intended the enhanced punishment to apply throughout the section's effective period. (*Ibid.*)

We likewise read the express sunset provision in former section 12022.6, subdivision (f), to reflect the Legislature's intent to apply the enhancement through the effective period of the provision.  To hold otherwise would lead to the absurd result that the specified sunset provision of January 1, 2018 would be replaced by a sunset provision that depends on when a defendant's sentence becomes final.  Further, as the Supreme Court in *Pedro T.* noted, "[A] rule that retroactively lessened the sentence imposed on an offender pursuant to a sunset clause would provide a motive for delay and manipulation in criminal

63

proceedings. When the Legislature signals, years in advance, its intention to reduce the punishment for an offense, defendant and counsel have a strong incentive to delay the finality of a judgment in the hope of eventually receiving the lessened, postsunset term." (*Pedro T., supra*, 8 Cal.4th at pp. 1046-1047.)

In addition, as the Legislature stated in amending former section 12022.6, "It is the intent of the Legislature that the amendments to Section 12022.6 of the Penal Code by this act apply prospectively only and shall not be interpreted to benefit any defendant who committed any crime or received any sentence before the effective date of this act." (Stats. 2007, ch. 420, § 2.) The Legislature therefore made clear its intent the enhancement applied only prospectively, and conversely, in former section 12022.6, subdivision (f), the provisions continue through the effective date of the sunset provision. Shiga has not pointed to any evidence of legislative intent to the contrary.[24]

---

[24] The holding in *People v. Nasalga* (1996) 12 Cal.4th 784, relied on by Shiga, is not to the contrary. In *Nasalga*, the Supreme Court applied the reasoning of *Estrada* to conclude the 1992 amendment to former section 12022.6, subdivisions (a) and (b), which increased the amount of loss required for the sentence enhancement, applied retroactively to the defendant's sentence because it was not yet final. (*Nasalga*, at p. 797.) In contrast to *Pedro T.*, former section 12022.6's sunset provision was not at issue in *People v. Nasalga*. The court also distinguished *Pedro T.* on the basis "the Legislature clearly indicated that its intent in enacting the statute in effect when the minor committed the crime was to punish offenders more harshly in order to address the threat to the public posed by an increase in vehicle thefts." (*Nasalga*, at p. 796.) Here, by contrast, we have no explicit statement of legislative intent other than the sunset provision,

64

F.     *The People Concede Error on the Remaining Issues**

Shiga contends the trial erred by failing to stay his sentence on count 3 for possession of flammable material pursuant to section 654 because count 3 was based on Shiga's possession of the flammable materials he used to commit the offense of aggravated arson for which the trial court imposed a sentence on count 1.  As the People concede, Shiga is correct. (*People v. Corpening* (2016) 2 Cal.5th 307, 311 [§ 654 bars multiple punishment for "a course of conduct encompassing several acts pursued with a single objective"]; *People v. Jackson* (2016) 1 Cal.5th 269, 354 ["""If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one."""].)

The People also concede the trial erred when it imposed two 5-year enhancements under section 451.1, subdivision (a), as to count 2.  Section 451.1, subdivision (a), provides "any person who is convicted of a felony violation of Section 451 shall be punished by a three-, four-, or five-year enhancement if one or more of the following circumstances is found to be true:  [¶]  . . .  [¶]  (4) The defendant proximately caused multiple structures to burn in any single violation of Section 451.  [¶]  (5) . . . [T]he arson was caused by use of a device designed to accelerate the fire or delay ignition."  As to count 2 for arson of structure in violation of section 451, subdivision (c), the jury found true the alleged circumstances Shiga proximately caused multiple structures to

---

which we read to reflect the Legislature's desire that the enhancement remain in effect through January 1, 2018.

*     See footnote, *ante*, page 1.

65

burn, and the arson was caused by use of an accelerant or device to delay ignition. The trial court imposed two 5-year enhancements based on the two true findings. However, section 451.1, subdivision (a), provides for a single enhancement "if one or more" of the enumerated circumstances is found to be true. Thus, only one 5-year enhancement under section 451.1, subdivision (a), was authorized as to count 2.

Finally, the People concede the trial court erred when it imposed a five-year enhancement under section 451.1, subdivision (a), as to count 1 for aggravated arson in violation of section 451.5. Section 451.1, subdivision (a), by its plain terms applies only to convictions for a "felony violation of Section 451." It has no application to convictions under section 451.5. Thus, the jury's true finding on the section 451.1, subdivision (a), enhancement allegation as to count 1 is reversed.[25]

## DISPOSITION

We reverse Shiga's convictions for arson on counts 2 and 5 and remand for the trial court to enter a conviction on one of the offenses under section 451, as elected by the People. We also reverse the jury's true finding on the section 451.1, subdivision (a), enhancement as to count 1. We remand for resentencing with directions for the trial court (1) to stay Shiga's sentence on count

---

[25] Although Shiga did not raise these sentencing errors in the trial court, "[a] claim that a sentence is unauthorized may be raised for the first time on appeal, and is subject to correction whenever the error comes to the attention of the reviewing court." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1048, fn. 7; accord, *People v. Dotson* (1997) 16 Cal.4th 547, 554.)

3 for possession of flammable material pursuant to section 654 and, (2) if it reinstates Shiga's conviction on count 2, to impose only one 5-year sentence enhancement under section 451.1, subdivision (a).


                                        FEUER, J.

WE CONCUR:


        PERLUSS, P. J.


        ZELON, J.